United States Courts
Southern District of Texas
FILED

JUL 0 1 2015

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CRIM. NO. _____ |
| | § | |
| VS. | § | **15 CR 346** |
| | § | |
| MKRTICH M. YEPREMIAN (1), | § | |
| A.K.A. MIKE YEPREMIAN; | § | |
| HARDING DUDLEY ROSS, M.D. (2); | § | **UNDER SEAL** |
| FAIZ AHMED, M.D. (3); | § | |
| MICHAEL WAYNE WILSON (4); | § | |
| JERMAINE DOLEMAN (5); | § | |
| ERIC JOHNSON (6), | § | |
|     DEFENDANTS | § | |

## INDICTMENT

THE GRAND JURY CHARGES:

## COUNT ONE
## CONSPIRACY TO COMMIT HEALTH CARE FRAUD
## (18 U.S.C. § 1349)

### General Allegations

At all times material to this Indictment, unless otherwise specified:

### The Medicare and Medicaid Programs

1.    Medicare was a federally funded health insurance program designed to provide medical care to individuals over age 65 and individuals with disabilities.

1

The Medicare payment system is composed of two divisions: Medicare Part A (hospital insurance) and Medicare Part B (medical insurance). Medicare Part A helped pay for inpatient hospital stays, skilled nursing facility services, home health services and hospice care. Medicare Part B helped pay for physician services, outpatient hospital services, medical equipment and supplies, and other health care services and supplies, including diagnostic testing, that were medically necessary and were ordered by a licensed medical physician or other qualified health care providers. Individuals who received benefits under Medicare were often referred to as Medicare "beneficiaries."

2.     The Medicaid program was a state-administered health insurance program funded by the United States Government and by the State of Texas. The Medicaid program helped pay for reasonable and necessary medical procedures and services provided to individuals deemed eligible under state low-income programs. The Texas Medicaid program was a cooperative federal-state program to furnish medical assistance to the indigent. The State of Texas contracted with Texas Medicaid & Healthcare Partnership (hereinafter referred to as TMHP) to process and pay claims submitted by health care providers.

3.     The Medicaid Program in Texas may pay a portion of a claim originally submitted to Medicare in the event the patient has both Medicare and Medicaid coverage. This portion was generally 20 percent of the Medicare allowance for the

billed charge.  Such claims were sent to Medicaid once processed by Medicare. Medicaid will pay its portion if Medicare originally allowed the claim.  If a Medicaid recipient was not also a Medicare beneficiary, the claims may be submitted directly to Medicaid.

4.     Medicare and Medicaid were a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

## THE DEFENDANTS

5.     MKRTICH M. YEPREMIAN, also known as MIKE YEPREMIAN, was the owner and/or operator of Empire Clinical Laboratory, Inc., in Houston, Texas; of Crawford Medical Services, Inc., in Houston, Texas; of Arca Medical Clinic, Inc., in Conroe, Texas; of Care Family Practice, Inc., in Houston, Texas.; of Mid City Healthcare, in Houston, Texas; and he resided in Houston, Texas.

6.     HARDING DUDLEY ROSS, M.D., was a physician licensed by the State of Texas to practice medicine and resided in Houston, Texas. ROSS worked with Defendant YEPREMIAN at Crawford Medical Services, Inc., in Houston, Texas; at Arca Medical Clinic, Inc., in Conroe, Texas; and at Care Family Practice, Inc., in Houston, Texas.

7.     FAIZ AHMED, M.D., was a physician licensed by the State of Texas to practice medicine who worked for Arca Medical Clinic, Inc., in Conroe, Texas, and for Defendant YEPREMIAN; and resided in Houston, Texas.

8.     MICHAEL WAYNE WILSON was a recruiter/marketer who sold patients and their Medicare billing information to Defendant YEPREMIAN; and resided in Houston, Texas.

9.     JERMAINE ANDREW DOLEMAN was a recruiter/marketer who sold patients and their Medicare billing information to Defendant YEPREMIAN, and resided in Houston, Texas.

10.    ERIC DEWAYNE JOHNSON was a recruiter/marketer who sold patients and their Medicare billing information to Defendant YEPREMIAN.

## THE CONSPIRACY

11.    Beginning in or around January of 2006 through to the present, the exact dates being unknown to the grand jury, in the Houston Division of the Southern District of Texas, and elsewhere, defendants

**MKRTICH M. YEPREMIAN
HARDING DUDLEY ROSS, M.D.,
FAIZ AHMED, M.D.,
MICHAEL WAYNE WILSON
JERMAINE ANDREW DOLEMAN
ERIC DEWAYNE JOHNSON**

did knowingly and willfully combine, conspire, confederate and agree with each other, and with other persons known and unknown to the grand jury, to commit and aid and abet certain offenses against the United States:

a.  To violate the health care fraud statute, that is, to knowingly and willfully

4

execute and attempt to execute, a scheme or artifice: (1) to defraud a health care benefit program affecting commerce, namely the Medicare and Medicaid programs; and (2) to obtain, by means of material false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, a health care benefit program, namely Medicare and Medicaid, in connection with the delivery of and payment for health care benefits, items and services, namely diagnostic testing, various blood tests and other services, in violation of Title 18 United States Code, Section 1347 (health care fraud statute).

## OBJECT OF THE CONSPIRACY

12.     It was the object of the conspiracy for the defendants to unlawfully enrich themselves by falsely and fraudulently representing to Medicare and Medicaid that diagnostic tests, including but not limited to ultra sounds, allergy tests, breathing tests and numerous laboratory tests performed on blood drawn from Medicare and Medicaid patients, were actually performed and medically necessary.

## MANNER AND MEANS

13.     It was part of the conspiracy that:

**EMPIRE**

14.    Defendant YEPREMIAN would and did file with the Texas Secretary of State a certificate of formation for Empire Clinical Laboratory, Inc. (Empire lab), on December 27, 2006.

15.    Defendant YEPREMIAN would and did open a Compass Bank account x4393 on or about January 18, 2007 for Empire lab, on which he was the sole signatory.

16.    Defendant YEPREMIAN's Empire Lab would and did bill on dead patients, including but not limited to patient W.W., who died in 1978 (billed upon in 2011); patient A.S., who died in 1998 (billed in 2009), and patient G.Y., who died in 2007 (billed in 2012).

**ARCA**

17.    S.M.W., who was paid by Defendant YEPREMIAN to be a nominee owner, would and did file a Texas Secretary of State certificate of formation for Arca Medical Clinic on April 9, 2012.

18.    S.M.W. would and did file a Medicare Application on or about April 16, 2012 for Arca Medical Clinic in Conroe, Texas, wherein S.M.W. was listed as "CEO/President."

19.    S.M.W. would and did request on or about April 16, 2012 that Medicare automatically deposit paid claims in a Bank of America account (x2657).

20.    Defendant YEPREMIAN would and did open a bank account on January 25, 2013 at Bank of America (x2657) in the name of Arca Medical Clinic, Inc., with YEPREMIAN as sole signatory.

21.    Defendant YEPREMIAN would and did open a "payroll" bank account on November 26, 2013 at Bank of America (x8074) in the name of Arca Medical Clinic, Inc., with YEPREMIAN as sole signatory.

22.    Defendant YEPREMIAN would and did open a bank account on January 22, 2014 at Bank of America (x6241) in his name and as sole signatory.

23.    Defendant YEPREMIAN would and did become the registered agent of Arca Medical Clinic, Inc., by filing a statement of change with the Texas Secretary of State on October 13, 2014.

24.    Defendant YEPREMIAN would and did pay S.M.W. of Arca Medical Clinic approximately $580 from Bank of America account (x6241).

25.    Defendant YEPREMIAN would and did pay S.M.W. approximately $1,101.00 from a Bank of America account (x3092), which was an account for another clinic as more fully explained below.

26.    Defendant YEPREMIAN would and did pay S.M.W. approximately $1,110.00 from a Wells Fargo account (x6648), which was an account for another clinic as more fully explained below.

**MID CITY**

27.    R.S., who was a nominee owner of Mid City Healthcare, would and did file a Secretary of State certificate of formation for Mid City Healthcare on January 21, 2010, with the same address as Crawford Medical Services, Inc.

28.    Defendant YEPREMIAN would and did pay C.L.T., also a nominee owner of another clinic, approximately $3,565.00 from a Wells Fargo Bank account (x6648) for Mid City Healthcare.

29.    Defendant YEPREMIAN would and did receive approximately $682,239.23 in paid Medicare claims deposited in that Mid City Wells Fargo account (x6648).

30.    Defendant YEPREMIAN would and did receive approximately $25,305.61 in paid Medicaid claims deposited in that Mid City Wells Fargo account (x6648).

**CRAWFORD**

31.    C.L.T., who was a nominee owner of Crawford Medical Services, Inc., would and did file an application with Medicare for Crawford Medical Services, Inc., on July 27, 2011.

32.    C.L.T. would and did list himself as "President/CEO" of Crawford Medical Services, Inc., in that application.

33.     Defendant YEPREMIAN would and did open a "payroll" bank account on May 16, 2011 at Bank of America (x2901) for Crawford Medical Services, Inc., with C.L.T. listed as owner of Crawford Medical Services, Inc., and YEPREMIAN listed as manager.

34.     C.L.T. would and did change the EFT account to Bank of America (x3092) on November 2, 2011.

35.     Defendant YEPREMIAN would and did open a bank account February 4, 2013 at Bank of America (x3092) for Crawford Medical Services, Inc., with YEPREMIAN as sole signatory.

36.     Defendant YEPREMIAN would and did receive approximately $1,644.769.37 in paid Medicare claims deposited in Crawford Medical's Bank of America account (x3092) from October of 2011 through April 2014.

37.     Defendant YEPREMIAN would and did receive approximately $92,922.44 in paid TMHP (Medicaid) claims deposited in Crawford's Bank of America account (x3092) from October of 2011 through April 2014.

38.     Defendant YEPREMIAN would and did transfer approximately $1,208,906.00 from Bank of America (x3092) to his personal account (x6241) from April 2011 through October 2014.

## CARE FAMILY PRACTICE

39.    Defendant YEPREMIAN would and did file with the Texas Secretary of State a certificate of formation for Care Family Practice, Inc., on September 22, 2014.

40.    Defendant YEPREMIAN would and did pay Defendant ROSS at least $99,750, based upon checks written on Crawford Medical's Bank of America account (x3092).

41.    YEPREMIAN would and did pay Defendant ROSS at least $17,750, based upon checks written on Arca Medical Services' Bank of America account (x2657).

42.    Defendant YEPREMIAN would and did bill Medicare and Medicaid for the fraudulent diagnostic testing through his various Houston-area clinics and the blood work through the Empire lab.

43.    Defendant YEPREMIAN would and did instruct his employees, including his relatives, to call Medicare ahead of time to make sure the Medicare patient could be billed upon, and had not been billed for similar diagnostic tests or blood work recently.

44.    Defendant YEPREMIAN would and did pay marketers/recruiters cash and in checks to bring patients to YEPREMIAN's various clinics and lab for false billing related to blood tests and diagnostic testing.

45.     Defendant YEPREMIAN would and did communicate with marketers, including Defendants DOLEMAN, WILSON, and JOHNSON regarding which of the Medicare and Medicaid patients qualified because they had no recent, similar billing, did not have HMO-type coverage, and therefore could be brought to the clinics to be tested and billed upon.

46.     Defendants WILSON, DOLEMAN, and JOHNSON would and did receive cash and checks from Defendant YEPREMIAN to bring Medicare and Medicaid patients to YEPREMIAN's various clinics and Empire lab.

47.     Defendants WILSON, DOLEMAN and JOHNSON would and did pay Medicare and Medicaid patients cash for allowing Defendants YEPREMIAN, ROSS and AHMED to order various diagnostic procedures and blood work to be performed on them regardless of need, and for allowing Defendant YEPREMIAN's clinics and lab to bill Medicare and Medicaid for those procedures and blood work.

48.     Defendant YEPREMIAN would and did pay marketer Defendant DOLEMAN at least $1,650, as shown by checks drawn on the Arca Medical Services Bank of America account (x2657).

49.     Defendant YEPREMIAN would and did pay Medicare patient and marketer T.M. $100 cash for allowing T.M. to be seen by Defendant ROSS and subsequently billed for numerous blood tests

50.    Defendant YEPREMIAN and his employees, including A.R., would and did instruct his employees to go to group homes and other locations to draw blood from Medicare and Medicaid patients in a "no blood work, no paper" scheme wherein Defendant YEPREMIAN would give various home health care companies fraudulent authorizations (Form 485s) from Defendants ROSS and AHMED to continue or renew home health care for Medicare and Medicaid patients in exchange for being able to bill blood work on the same patients through his Empire lab.

51.    Employee A.R., who worked at Defendant YEPREMIAN's various clinics, would and did instruct the paid Medicare and Medicaid beneficiaries as they waited to be treated at YEPREMIAN's clinics that they must state on their patient forms that they were at the clinic for "diagnostics."

52.    Defendants ROSS and AHMED would and did routinely cause Medicare and Medicaid to be billed repetitively for the same types of diagnostic testing and the same blood work on patients without being the patient's primary care physician and without any follow-up with the Medicare and Medicaid patient after testing and blood work was performed.

53.    Employees at Defendant YEPREMIAN's clinics would and did routinely perform ultra sound, breathing tests and other diagnostic tests on Medicare and Medicaid patients before they were seen by Defendants ROSS and AHMED and/or before the tests were ordered by Defendants ROSS and AHMED.

54.     Defendants ROSS and AHMED would and did routinely order medically unnecessary scratch allergy test on Medicare and Medicaid patients, and YEPREMIAN's Empire lab would and did bill for that allergy test that allegedly involved the injection into the beneficiary's skin of 75 separate allergen substances.

55.     Defendants ROSS and AHMED would and did routine order medically unnecessary blood tests, and YEPREMIAN's Empire lab would and did routinely bill for bloods tests for the presence of cocaine (Code 82520); PCPs (Code 83992); opiates (Code 83925); and methadone (Code 83840) in Medicare and Medicaid patients.

56.     After Medicare and Medicaid deposited payments into YEPREMIAN's bank accounts, YEPREMIAN would and did transfer proceeds of the fraud to his relatives, and a company that was held in the names of his relative.

57.     YEPREMIAN would and did pay Forever Management & Consulting, owned by YEPREMIAN's relative C.Y., at least $118,900, using checks written on Crawford Medical's Bank of America account (x3092), including one check numbered 1271 and dated March 19, 2013 for $33,000.

58.     YEPREMIAN would and did pay Forever Management & Consulting, owned by YEPREMIAN's relative C.Y., at least $130,000, using checks written on Mid City Healthcare's Wells Fargo account ending in x6648.

59.     YEPREMIAN would and did pay relative J.Y. at least $122,000, based upon checks written on Crawford Medical's Bank of America account (x3092), including one check numbered 147 and dated January 6, 2014 for $50,000.

60.     Relative J.Y. would and did receive at least $845,000, as reflected in checks written to J.Y. signed by Defendant YEPREMIAN and from YEPREMIAN's Bank of America account (x6241), into which Defendant YEPREMIAN would and did deposit at least $1,208,906 in fraudulent Medicare and Medicaid funds from Crawford Medical's Bank of America account (x3092).

61.     YEPREMIAN would and did write a check numbered 154 to J.Y., drawn on his Bank of America account (x6241), dated April 11, 2014 for $100,000.

62.     YEPREMIAN would and did pay relative J.Y. $50,000, using checks written on Arca Medical Services' Bank of America account (x2657).

63.     YEPREMIAN would and did wire $125,000 on May 23, 2013 from YEPREMIAN's Bank of America account (x6241) made payable to YEPREMIAN's relative J.Y.

64.     All the defendants would and did cause Medicare and Medicaid to be billed for diagnostic procedures and blood tests that were medically unnecessary and not performed.

65.     Defendants would and did cause Empire lab to fraudulently bill Medicare at least $6,397,946.75, which then paid at least $5,015,222.93 on those

14

claims. All defendants would and did cause Medicaid to pay at least $46,846.12 in false claims.

66.     Defendants would and did cause Crawford Medical Services to fraudulently bill Medicare $3,128,392.24, which then paid approximately $2,134,961.28 of those claims. All defendants would and did cause Medicaid to pay approximately $125,515.84 in false claims.

67.     Defendants would and did cause Arca Medical Clinic to fraudulently bill Medicare $744,404.70, which then paid $472,451 of those claims.

68.     Defendants would and did cause Care Family Practice to fraudulently bill Medicare $801,361, which then paid $580,758.72.

69.     Defendants would and did cause Mid City Healthcare to fraudulently bill Medicare $1,459,322.04, which then paid $680,514.44. All the defendants would and did cause Medicaid to pay $25,313.94 in false claims.

**All in violation of Title 18, United States Code, Section 1349.**

## COUNTS 2-17

### HEALTH CARE FRAUD
### (18 U.S.C. §§ 1347 AND 2)

## INTRODUCTION

1.     The factual allegations of Count One of this Indictment are re-alleged and incorporated here as though fully set forth herein.

2.     Beginning in or about January of 2006, the exact date being unknown, and continuing thereafter to the present, defendants identified herein billed and caused Medicare to be billed approximately $12,531,426.73, with approximately $8,883,908.37 paid by Medicare, and $197,675.90 paid by Medicaid to defendants.

## PURPOSE OF THE SCHEME TO DEFRAUD

3.     It was the purpose of the scheme to defraud to obtain money from the Medicare and Medicaid programs for the defendants to unlawfully enrich themselves by falsely and fraudulently representing to Medicare and Medicaid that diagnostic tests, including but not limited to ultra sounds, allergy tests, breathing tests and numerous laboratory tests performed on blood drawn from Medicare and Medicaid patients, were actually performed and medically necessary.

4.     Beginning on or about January of 2006, and continuing thereafter to the present, in the Houston Division of the Southern District of Texas, the defendants,

**MKRTICH M. YEPREMIAN**
**HARDING DUDLEY ROSS**
**AHMED FAIZ, M.D.,**
**MICHAEL WAYNE WILSON**
**JERMAINE ANDREW DOLEMAN**
**ERIC DEWAYNE JOHNSON**

as identified in the specific counts below, aiding and abetting each other, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, namely Medicare and

Medicaid, and to obtain by means of material, false and fraudulent pretenses, representations and promises, any of the money and property owned by, and under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items and services, to wit; on or about the listed dates, the defendants caused to be submitted false and fraudulent claims to Medicare as indicated below:

## COUNTS 2-17

| Ct | Patient Medicare/ Medicaid Number | Codes | Dates of Service (on or about) | Approx. Amount Billed to Medicare | Defendants |
|---|---|---|---|---|---|
| 2 | Medicare No. x6684A R. R. | Numerous blood work codes along with various diagnostic testing codes | 4-29-15 | $1,162.38 | YEPREMIAN, ROSS and JOHNSON |
| 3 | Medicare No. x0931A C. J. | Numerous blood work codes along with various diagnostic testing codes | 4-29-15 | $1,178.54 | YEPREMIAN, ROSS and JOHNSON |

| 4 | Medicare No. X6913A C. M. | Numerous blood work codes along with various diagnostic testing codes | 2-13-14 | $1,311.39 | YEPREMIAN, ROSS and DOLEMAN |
|---|---|---|---|---|---|
| 5 | Medicare No. X8425A L. A. | Numerous blood work codes along with various diagnostic testing codes | 3-28-14 (diag-nostics) 3-31-14 (labs) | $1,061.10 | YEPREMIAN, ROSS and DOLEMAN |
| 6 | Medicare No. X6645A R. W. | Numerous blood work codes along with various diagnostic testing codes | 2-20-14 | $1,398.98 | YEPREMIAN, ROSS and DOLEMAN |
| 7 | Medicare No. X8942A O. O., Jr. | Numerous blood work codes along with various diagnostic testing codes | 2-17-14 | $693.48 | YEPREMIAN, ROSS and DOLEMAN |

| 8 | Medicare No. x8165A D. W. | Numerous blood work codes along with various diagnostic testing codes | 7-9-14 | $1,004.26 | YEPREMIAN, ROSS and WILSON |
|---|---|---|---|---|---|
| 9 | Medicare No. X3153A A. S. | Numerous blood work codes along with various diagnostic testing codes | 3-11-14 | $1,269.43 | YEPREMIAN, ROSS and WILSON |
| 10 | Medicare No. X3922A M. H. | Numerous blood work codes along with various diagnostic testing codes | 3-18-14 | $1,364.64 | YEPREMIAN, ROSS and WILSON |
| 11 | Medicare no. x1641A T. M. | Numerous blood work tests | 7-20-12 | $240.92 | YEPREMIAN and ROSS |

| 12 | Medicare No. X8425A L. A. | Numerous blood work codes along with various diagnostic testing codes | 12-13-14 | $718.68 | YEPREMIAN and AHMED |
| 13 | O. O., Jr. X8942A | Numerous blood work codes along with various diagnostic testing codes | 12-11-14 (diag-nostics) and 12-12-14 (labs) | $982.99 | YEPREMIAN and AHMED |
| 14 | W. B. X0675A | Numerous blood work codes along with various diagnostic testing codes | 9-22-14 | $1,316.89 | YEPREMIAN and AHMED |
| 15 | W. B. X0675A | Numerous blood work codes along with various diagnostic testing codes | 12-2-14 | $944.59 | YEPREMIAN and AHMED |

| 16 | M. B.<br>X5979A | Numerous blood work codes along with various diagnostic testing codes | 10-25-14 | $685.99 | YEPREMIAN and AHMED |
| 17 | Medicare No.<br>M. B.<br>X5979A | Numerous blood work codes along with various diagnostic testing codes | 1-30-15 | $957.88 | YEPREMIAN and AHMED |

**In violation of 18 U.S.C. §§ 1347 and 2.**

## COUNTS 18 THROUGH 21
## PAYMENT AND RECEIPT OF HEALTHCARE KICKBACKSs
## (42 U.S.C. § 1320a-7b (b)(1) & (b)(2) and 18 U.S.C. § 2)

1.      The factual allegations contained in Counts 1 through 17 of the

Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2.      On or about the dates enumerated below, in the Houston Division of

the Southern District of Texas and elsewhere, the defendants as set forth below,

aiding and abetting each other and others known and unknown to the Grand Jury,

did knowingly and willfully offer and pay remuneration, specifically kickbacks and

bribes, directly and indirectly, overtly and covertly in exchange for referring

individuals for the furnishing and arranging for the furnishing of any item and

service for which payment may be made in whole or in part by Medicare or

Medicaid; and by knowingly and willfully soliciting and receiving remuneration,

specifically kickbacks and bribes, directly and indirectly, overtly and covertly, in

return for referring individuals for the furnishing and arranging for the furnishing

of any items and service for which payment may be made in whole or in part by

Medicare or Medicaid:

| Count | Defendant | Amount of Kickback | Date Kickback Paid | Patient(s) |
|---|---|---|---|---|
| 18 | YEPREMIAN | $500 | March 11, 2014 | Kickback payment made to WILSON for recruiting patient A.S. and others. |
| 19 | WILSON | $500 | March 11, 2014 | Kickback accepted by WILSON for recruiting patients A.S. and others. |
| 20 | YEPREMIAN. | $100 in cash | July 20, 2012 | Kickback paid to patient T.M., who allowed his Medicare number to be billed for blood work |

| 21 | JOHNSON | $50 in cash | April 29, 2015 | Kickback paid by JOHNSON to marketer for providing 2 patients, R.R. and C.J., to be billed by YEPREMIAN |
|----|---------|-------------|----------------|---------|

**In violation of 42 U.S.C. 1320a-7b (b)(1) & (b)(2) and 18 U.S.C. 2.**

## COUNTS 22 THROUGH 25
### (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity – 18 U.S.C. § 1957)

1.     Factual allegations contained in Count One of this Indictment are re-alleged and incorporated as though fully set forth herein.

2.     Factual allegations contained in Counts 2 through 21 of this Indictment are re-alleged and incorporated as though fully set forth herein.

3.     On or about the dates set forth below, in the Houston Division of the Southern District of Texas and elsewhere, the defendant

### MKRTICH M. YEPREMIAN,
### A.K.A. MIKE YEPREMIAN

did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, health care fraud in violation of

23

Title 18 U.S.C. § 1347, conspiracy to commit health care fraud in violation of 18

U.S.C. § 1349, and violation of the Anti-Kickback statutes 42 U.S.C. 1320a-7b

(b)(1) & (b)(2), as follows:

| Count | Date | Monetary Transaction |
|-------|------|----------------------|
| 22 | 4-11-14 | YEPREMIAN writes check #154 for $100,000, drawn of YEPREMIAN's Bank of America account (x6241), made payable to YEPREMIAN's relative J.Y. |
| 23 | 3-19-13 | YEPREMIAN writes check #1271 for $33,000, drawn on Crawford Clinic's Bank of America account (x3092), made payable to Forever Management and Consulting, Inc., owned by YEPREMIAN's relative C.Y. |
| 24 | 1-6-14 | YEPREMIAN writes check #147 for $50,000 drawn on YEPREMIAN's Bank of America account (x6241), made payable to YEPREMIAN's relative J.Y. |
| 25 | 5-23-13 | YEPREMIAN transfers by wire $125,000 from YEPREMIAN's Bank of America account (x6241), made payable to YEPREMIAN's relative J.Y. |

**In violation of Title 18, United States Code, Section 1957.**

## NOTICE OF FORFEITURE
### 18 U.S.C. Section 982(a)(7)

1.      Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendants,

**MKRTICH M. YEPREMIAN
HARDING DUDLEY ROSS, M.D.,
FAIZ AHMED, M.D.,
MICAHEL WAYNE WILSON
JERMAINE ANDREW DOLEMAN
ERIC DEWAYNE JOHNSON,**

that upon conviction of conspiracy in violation of Title 18, United States Code, Section 1349, or of a violation of Title 18, United States Code, Section 1347, or of a violation of 42 U.S.C. § 1320a-7b(b)(1) & (b)(2) as charged herein, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to such offenses, is subject to forfeiture.

## NOTICE OF FORFEITURE
### 18 U.S.C. § 982(a)(1)

2.      Pursuant to Title 18, United States Code, Section 982(a)(1), the United States of America gives notice to the defendant

**MKRTICH M. YEPREMIAN**

that upon conviction of a violation of Title 18, United States Code, Section 1957, all property, real or personal, involved in money laundering offenses or traceable to such property, is subject to forfeiture.

## Money Judgment

3.      Defendants are further notified that, upon conviction, the United States of America shall seek a personal money judgment in an amount equal to the total value of the property subject to forfeiture, which is at least $9,081,584.27, and for which the Defendants may be jointly and severally liable.

## Property Subject to Forfeiture

4.      Defendants are further notified that, upon conviction, the property subject to forfeiture includes, but is not limited to, $9,081,584.27 in U.S. dollars.

## Substitute Assets

5.      Defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission of any defendant:

  (A) cannot be located upon the exercise of due diligence;

  (B) has been transferred or sold to, or deposited with, a third party;

  (C) has been placed beyond the jurisdiction of the court;

  (D) has been substantially diminished in value; or

  (E) has been commingled with other property which cannot be divided without difficulty,

the United States will seek to forfeit any other property of the Defendants up to the total value of the property subject to forfeiture pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

Original Signature on File

_____
FOREPERSON

KENNETH MAGIDSON
UNITED STATES ATTORNEY

BY: _____
Suzanne Bradley
Special Assistant United States Attorney